CAPELING *v.* SAGINAW COAL CO.

1. MASTER AND SERVANT — PERSONAL INJURIES — NEGLIGENCE OF MASTER — VIOLATION OF STATUTORY DUTY — ASSUMED RISK — FELLOW-SERVANTS.

The doctrines of fellow-servant and assumed risk do not apply to a case in which the injury to plaintiff was caused by the negligence of an incompetent servant employed as an engineer in violation of Act No. 100, Pub. Acts 1905. *Layzell v. J. H. Somers Coal Co.,* ante, 268, followed.

2. SAME—APPLICATION OF STATUTE—OPERATION OF MINE.

That the removal of coal from the sump at the bottom of the shaft of defendant's coal mine, during which operation plaintiff was injured, was done on Sunday, when the mine was not in operation, does not relieve defendant from liability for injuries caused by an incompetent servant, employed as an engineer in violation of Act No. 100, Pub. Acts 1905, the removal of the coal so that the cage might go low enough in the shaft to perform its office being as much a part of the operation of the mine as any other work.

3. SAME—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

In an action by a servant, employed in a coal mine, against the owner of the mine, for personal injuries caused by the negligence of an incompetent servant, employed as an engineer in charge of hoisting machinery, in violation of Act No. 100, Pub. Acts 1905, evidence examined, and *held,* to make a case for the jury.

Error to Saginaw; Gage (William G.), J.   Submitted
February 21, 1908.   (Docket No. 127.)   Decided June
27, 1908.   Motion for rehearing granted September 8,
1908.   Reargued February 9, 1909.   Former opinion af-
firmed June 7, 1909.

Case by Louis E. Capeling against the Saginaw Coal
Company for personal injuries.   There was judgment for
defendant on a verdict directed by the court, and plaintiff
brings error.   Reversed.

*De Vere Hall*, for appellant.

*Humphrey & Grant*, for appellee.

MOORE, J.   Defendant company in March, 1906, was
operating a coal mine through a double compartment
shaft about 125 feet deep.   The men found their way in
and out of the mine by riding in cages up and down the
shaft.   As one cage ascended the other descended.   The
coal found its way to the surface through the same shaft.
The cages are under the control of an engineer who can-
not see the cages for most of the time.   A system or code
of signals is provided by a bell triangle, by a bell, by a
steam whistle, and by a speaking tube; the triangle being
located in the engine room near the engineer, the bell at
the bottom of the shaft, the steam whistle about 10 feet
above the mouth of the shaft in the tipple, and the speak-
ing tube extending from the bottom of the shaft to the
engine room on the surface.   The position of the cages in
the shaft is known to the engineer through an indicator
located in front of him, with two dials pointing in oppo-
site directions, one for each cage.   When one of the dials
points to a certain place on the indicator it shows that the
cage is in the uppermost part of the tipple where the coal
is tipped upon inclined screens of different sizes over
which it passes to the railroad cars.   Another point of the

indicator shows that the cage is at the surface, and another that it rests at the botton of the shaft.

The sump is the lower part of the shaft underneath the cage when its floor is on a level with the floor of the mine. As the coal is lifted to the surface lumps sometimes fall off the cars, beneath the cages, dropping into the sumps, and after a certain accumulation it interferes with the lowering of the cages to the desired level, and it then becomes necessary to "clean out the sump." Plaintiff was a common laborer in the mine. He was sent into the sump to clear out the coal. He had been at work but a few minutes before the cage descended upon him injuring him severely. He sued to recover damages. After his testimony was all in, and before any was offered on the part of defendant, the defendant's attorney moved the court to direct a verdict in favor of defendant for the following among other reasons:

"1. The statute of the State of Michigan, under which plaintiff claims his right of action in this suit, was approved May 10, 1905, and given immediate effect. The undisputed evidence in this case shows that the servant Patton had been in defendant's employ and performed the same duties as performed by him upon the day when the accident happened, and of which plaintiff complains, for at least four years prior to the passage of the act in question, and there is no evidence in the case tending to show that at the time of the employment of said Patton he was not competent to perform all duties and acts required of him under said employment. * * *

"4. The servant Patton and the plaintiff in this case were fellow-servants, and had worked together at the place in question, each performing the same duties for the defendant as on the day of the accident, for a period of at least five years prior to the happening of the accident, and being fellow-servants, the negligent act of the servant Patton will not make the defendant liable to the plaintiff in this action. * * *

"6. The undisputed evidence in the case shows that the plaintiff's injuries were caused on account of the servant Patton for some reason forgetting that the plaintiff was in the sump, and, in answer to a signal, lowered the cage on

top of the plaintiff causing the injury of which he complains. The undisputed evidence shows that the signal was to lower the cage, that the servant Patton intended to lower the cage, and that he did lower the cage exactly as he intended to do, and this act of lowering the cage was not the act of an incompetent servant but constituted a single negligent act of a competent fellow employé and for which the defendant is not liable in this case.

"7. Under the undisputed evidence in this case, the plaintiff and the servant Patton were fellow-servants and the sole cause of the accident was the negligent act of the servant Patton, and was not due to any fault or negligence upon the part of the defendant, and the plaintiff is not entitled to recover and your verdict must be for the defendant of no cause of action."

The plaintiff asked the judge to charge the jury in part as follows:

"1. On March 25, 1906, there then was, and now is, in force a law of this State which, in effect, provides for the protection of the health, lives and interests of the coal miners of the State, and by the third section of the act comprising such law it is provided that only competent and trustworthy engineers shall be permitted to operate the cages and hoisting devices in all coal mines of this State. * * * * 

"3. By said law the duty was imposed upon defendant of permitting no one but a competent and trustworthy engineer to operate its cages and hoisting devices. This law means that the employé operating such cages and devices must be an engineer, and I charge you, as a matter of law, that unless said Patton was, in fact, an engineer, he was unauthorized under said law to operate such cages and devices."

If No. 3 is refused then:

"4. By said law the duty was imposed upon defendant of permitting no one but a competent and trustworthy employé, acting as engineer, to operate its said cages and hoisting devices. This law means that the employé operating such cages and devices must possess the qualifications of a reasonably competent and trustworthy engineer, and I charge you as a matter of law that unless said Patton was a reasonably competent and trustworthy

engineer he was unauthorized under said law to operate such cages and devices.    *    *    *

" 7. If you determine that Patton is not a reasonably competent and trustworthy engineer you will then determine whether his want of competency and trustworthiness was so open and apparent before March 25, 1906, that his want thereof was known, or should have been known, to defendant's superintendent in charge of said mine.    Unless his want of competency and trustworthiness was such that said superintendent, in the exercise of reasonable supervision, did or should have learned of it, defendant would not be charged with knowledge or notice of his incompetency or untrustworthiness.

" 8. Should you find that Patton was not reasonably competent and trustworthy as engineer, this, of itself, would not charge the defendant with responsibility for his act of lowering the cage onto plaintiff, unless you also find that such act was one performed by him because of permission from defendant before that time granted to him, or suffered by defendant to be performed by him, and that the particular act was a careless and negligent one.

" 9. Should you find for plaintiff on the several questions relating to the want of competency and trustworthiness of Patton and his negligence and the negligence of defendant in permitting him to operate such cage, still you cannot return a verdict for plaintiff unless you further find that he, plaintiff, was himself free from fault or negligence contributing to his injury.    You have heard the testimony as to the manner of cleaning the sump and the measures taken, if any, to guard against liability to injury.    Take this and all other evidence bearing thereon into consideration, and then determine whether plaintiff was free from fault or negligence.    If you think not, he cannot recover.    If he was, then he may recover."

The judge refused to give the requests to charge and directed a verdict in favor of defendant.    The case is brought here by writ of error.

It was the claim of plaintiff that defendant did not comply with the law in employing a man to operate the cages.

The title of Act No. 100 of the Public Acts of 1905, so far as material to this controversy, is:

"An act to provide for the protection of the health, lives and interests of the coal miners of Michigan and to provide for the inspection of all coal mines in this State."

Section 3 of the act provides:

"That only a competent and trustworthy engineer shall be permitted to operate the cages and hoisting devices in all coal mines in this State."

It will be sufficient for the purposes of this case to quote part of the testimony of plaintiff and of the man in charge of the cages when the accident happened. Mr. Capeling's testimony was in part as follows:

"I was at the mine on the morning in question about a quarter after six and Mr. Pugh went down in the mine with me; I did not see the engineer that morning before I was injured, but did see Mr. Patton, the fireman; either I or Pugh gave the signal to lower the cage. When we stepped on the cage our backs were toward the engine room and we could not see the engineer or fireman as a flat car was in the way. I personally do not know who lowered the cage that morning in answer to our signal. When I saw the fireman that morning he was putting in fire under the boiler and was at a distance of twenty or twenty-five feet from where anyone would be who was to be lowered in the cage.  *  *  *

"There were three of us, Mr. Pugh, Mr. Clements, the assistant superintendent, and myself. Mr. Clements did not give me any directions or instructions at that time. I had cleaned out the sump before. At the time we started our work the east cage was at or near the bottom and I rang one bell and when I got it where I wanted it I gave one signal to stop the cage. That was the proper signal and the cage stopped. I could not hear the bell above when I stopped it and I went and phoned and told him not to move until I told him to, that I was going in the sump and not to move the cage until I told him to. I did not know who answered me and I could not recognize the voice. The tube led to the engine room and the end of the tube was right where the engineer stood when he moved the lever. The person to whom I telephoned said, 'all right.' I did not mention my own name and I could hear his voice distinctly. I then went into the sump to work. When the sump is cleaned out the cage will go down within about a foot and

a half of the bottom. On this day there was coal in the sump up to the cage's sides, which was about a foot and a half from the bottom, and the east sump would not stand any more coal without interfering with the cage going down. Mr. Pugh and Mr. Clements were on the south side of the shaft on the sheet facing me when I started to work. When I had thrown up a half dozen shovels of coal the cage came down upon me without any warning or signal of any kind. I could not have heard the bell where I was if it had been rung as it was too far away, but could have heard the whistle if it had been blown. No whistle was blown and there was no noise to drown it. I did not know that the cage was coming down until I was fast underneath it."

He also testified that Mr. Patton was a fireman and he had been in the habit of raising and lowering the cages.

Mr. Patton testified in part:

"My age is fifty-six. In March, 1906, I was in the employ of defendant at this mine in Buena Vista. I have been employed there in the neighborhood of nine years, all told, and during all that time I was firing this particular mine. I went there shortly after the mine started. I worked with the first engineer for six months, then went to work for the gas company and then went back to the mine when Charles O'Brien was engineer and have remained there as fireman until the present time. * * *

"In March, 1906, the firemen were there eight hours each and we changed around every two weeks; that is, I would be with the engineer as fireman for two weeks and then four weeks wouldn't be, and then for two weeks I would be back again with him.

"Q. Were you ever engineer in that mine?

"A. No, sir.

"Q. Were you ever anything other than the fireman at the mine?

"A. That's all.

"Q. Was there ever a time from the day you first went there when there wasn't an engineer over you at that mine? * * *

"A. Oh, always been an engineer in their employ, yes. The duties of each fireman are the same. * * *

"I got to this mine on the 25th day of March, 1906, about half past six. The engineer was not there when I

got there. He came about half past seven. I was well acquainted with plaintiff and knew Mr. Pugh. It was not known to me and the engineer that they were to clean out the sump until plaintiff informed me. He telephoned up to me and told me to raise my steam, that he was going to clean the sump. He said to raise the steam so as to start the pumps up faster. That was probably three-quarters of an hour or an hour before I got the signal to raise the cage. I recognized the voice of the man speaking and knew it was plaintiff. He spoke through the speaking tube. * * * I couldn't say that he said who he was when he telephoned me, but I knew the voice and knew he was to do the work. I raised the steam. The engineer wasn't there when he gave me the orders and I did not know before that the sump was to be cleaned out that day. After he got the water pumped out he 'phoned up to me or whistled up to me and notified me he was going in the sump and he gave me the signals for me to raise the cage. He 'phoned me first and said: 'I am to go in.' I knew what that meant. It meant he was going down in the sump to clean it out. He rang the bell for me to hoist the cage. I hoisted it, I should judge, about nine or ten feet; I couldn't say because I wasn't down there; I could tell on the indicator pretty near. I raised the east cage and lowered the west about ten feet. When I got the request to raise the cage the indicator showed that the east cage was at the bottom. After he got the cage up about ten feet he says, 'Now I am going in the sump.' He rang one bell when the cage was about ten feet up to stop it. This signal was the usual signal to stop the cage. * * *

"When I raised the cage, when he wanted it up so high he rung the bell for me to stop, and when he done that he went to the 'phone and 'phoned me that he was going in the sump. * * * I knew that he would be in the east sump because I raised the east cage. I went directly over to the engineer and notified him not to move the cage; that is after I got it up ten feet and plaintiff telephoned me and I then went to the engineer and said, 'Max, Louie has gone in the sump; don't move the cage.' He heard me and answered me. He was in the boiler giving Joseph Schultz, the other man, instructions. I couldn't say whether he was doing anything else there. He was not then doing any of the manual work himself. After I told the engineer, I thought it would be a good

chance for me to get in the coal and I went up on the tramway in the fire room and there was a strap bent on the door and I was trying to straighten that; a strap for a hinge.

"*Q.* How long were you up there trying to fix the door?

"*A.* Well, it was about four—three to four minutes—from the time I left the engine room until I got back again.

"*Q.* How far away was this door where you were doing that work from the engine room?

"*A.* About 45 feet I should think, directly up about 5 or 6 feet up above the fire room—so as to dump coal into the bins.

"*Q.* Is it about 40 feet away?

"*A.* Yes.

"*Q.* And did you go directly from the engineer to getting the coal in and to fixing the door—which?

"*A.* I went directly to get in the coal.

"*Q.* How much coal did you get in?

"*A.* I didn't get any in yet; I was getting ready to get it in.

"*Q.* Then you didn't do anything except to try and fix the door?

"*A.* That's all.    *    *    *

"*Q.* How long did you work at it?

"*A.* I worked at it about two minutes and they rung the bell.

"*Q.* Then you heard the bell?

"*A.* Yes.

"*Q.* This bell you heard, what was it?

"*A.* A signal from the landing in the shaft.

"*Q.* From the top of the shaft?

"*A.* Yes.

"*Q.* What did it signify?

"*A.* Well I only heard two bells at the time.

"*Q.* You heard just two rings?

"*A.* That's all.

"*Q.* You were pounding with the hammer?

"*A.* Yes.

"*Q.* Would the pounding of the hammer tend to drown the sound of the rings somewhat?

"*A.* It would from that part.

"*Q.* You don't know how many rings were given?

"*A.* No, sir.

"*Q.* When you heard the two rings what did you do?

"*A.* Why, I went directly to the engine and lowered the cage.

"*Q.* You heard Mr. Behm's testimony as to the signals he gave did you?

"*A.* Yes.

"*Q.* What did those signals he says he gave indicate?

"*A.* Well, it might indicate to draw my attention and I wouldn't know what to make of it.

"*Q.* Would it be a signal upon which you would move the cage?

"*A.* No, sir, not according to that.

"*Q.* Were you striking the strap at about the time you heard the bells?

"*A.* Yes.

"*Q.* Did you hear the two bells after you struck the last blow?

"*A.* Just about—while I was striking there I heard two bells.

"*Q.* Did you make any investigation to determine whether there were more than two bells sounded?

"*A.* It came all so sudden I couldn't—just like a dream—it was a little part of forgetfulness on my part.

"*Q.* You are getting too far along—I wasn't—after you realized you were striking with a hammer on this strap and that the bell was ringing and that the sound of the striking on the strap might drown out the bell, did you make any investigation to determine how many more bells had been sounded than the two you heard?

"*A.* No, sir. * * *

"*Q.* What were you striking it with?

"*A.* A hammer.

"*Q.* So it was metal striking metal was it?

"*A.* Yes.

"*Q.* As soon as you heard the bells what did you do?

"*A.* I went directly to the engine. * * *

"*Q.* Did you see the engineer?

"*A.* No, sir,

"*Q.* Did you say anything to him?

"*A.* Not at that time.

"*Q.* Did you say anything to anyone?

"*A.* No, sir.

"*Q.* Did you see anyone about?

"*A.* No, sir.

"*Q.* But you did know signals had been given by some-one at the mouth of the shaft?

"*A.* I didn't know they were at the mouth of the shaft; I supposed it was below. * * *

"*Q.* And what did you do?

"*A.* I lowered the cage.

"*Q.* Now did you do anything other than you have already stated here except to pass directly from pounding the strap, go to the levers that work the cage, and drop the cage?

"*A.* No, I didn't have time.

"*Q.* What was there that interfered with you taking the time?

"*A.* The bell ringing.

"*Q.* You were assuming to control the cage yourself, were you not?

"*A.* Yes.

"*Q.* And you could lower it or raise it or not just as you desired?

"*A.* Yes.

"*Q.* Now I ask you whether you did anything between these two acts other than to go directly from pounding on the strap and using the levers to lower the cage?

"*A.* No. * * *

"*Q.* Did you hesitate at the levers at all before you moved the cage?

"*A.* No, sir.

"*Q.* You didn't wait for any further signals?

"*A.* No, sir.

."*Q.* How long had it been from the time that Louie had telephoned you that he was going into the sump to the time that you lowered the cage?

"*A.* About three or four minutes I should judge.

"*Q.* Did you recollect the telephone which he sent you?

"*A.* Yes, I had it in mind; I told Max about it.

"*Q.* At the time you lowered the cage did you have it in your mind?

"*A.* No, sir; I forgot it.

"*Q.* And when did it occur to you next that Louie had telephoned you that he was going in the sump?

"*A.* Just about as I got the cage at the bottom I thought of it.

"*Q.* You thought of it?

"*A.* Yes.

"*Q.* What did you do?

"*A.* I tried to stop the engine.

"*Q.* Was any signal given to you to warn you that you should stop the cage?

"*A.* No, sir.

"*Q.* It came to you, did it?

"*A.* It came to me.

"*Q.* Then what you mean is that at that particular time it had passed from your mind that Louie had told you he was going into the sump?

"*A.* Yes. * * *

"CROSS-EXAMINATION.

"By Mr. Humphrey:

"Before that morning I had operated the engine in letting men down and bringing them up. There might have been three or four or five calls that morning for the cage. Mr. O'Brien left as engineer a little over a year ago. I worked there about seven years with him. During all of the time I worked there the engineer would be at the mine when the mine was in operation eight hours a day or a little longer, probably nine hours a day, and the other fifteen hours of the day during all of that time, the firemen had charge of the engine and operated it.

"*Q.* And was that a part of their duties?

"*A.* I guess that was a part of our duties. * * *

"For instance, I would be with the engineer for two weeks in the day run and the next four weeks I would be on when the engineer was off. On two of the shifts the engineer wouldn't be with me and during all that time the fireman would operate the engines. At such times as that the men would go up and down in the shaft at different times and materials would be hoisted up and let down; timbers for timbering and things of that kind. * * *

"*Q.* Whatever timbering would be done of that kind the timbers taken down would be taken down by the firemen?

"*A.* Yes.

"*Q.* And what men would go down would be in charge of the fireman?

"*A.* Yes. There were men working in the mine overtime frequently and they would be handled by the firemen. That had been so for the full nine years that I had been working there and that situation was well known to everybody about the mine, to all the men. That was the only way the mine was operated. Before working at this

mine I worked at gas fitting; fitting pipes. I had a small engine there I kept up, too. It was merely for crushing coke and such things as that.

"*Q.* Have you ever acted as engineer and run an engine?

"*A.* Yes.

"*Q.* For how many years?

"*A.* Let's see. About twelve years, all told."

He then told in detail for whom he had worked as engineer. On the re-direct examination he testified:

"At these several places where I was employed I did not operate an elevator or cage; they were stationary engines. Until I had done such work as I did for the defendant I was never employed in and about machinery where I raised and lowered men."

It has been observed that in the reasons of the counsel for defense why a verdict should be directed, it is claimed that the fellow-servant doctrine, so-called, should apply, and also the doctrine of assumption of risk, inasmuch as the plaintiff knew Mr. Patton was in the habit of raising and lowering the cages. A long and able argument is made in the brief of counsel·in support of these contentions. This very statute has been recently construed by this court in a case where both of these contentions were made and fully discussed by the court in the opinion. The case is *Layzell* v. *Coal Co.*, ante, 268. The conclusion reached was averse to the contention of counsel for defendant. The case is so recent that, as to this feature of the case, we shall content ourselves with referring to that case.

It is claimed that, as this work was done on Sunday when the mine was not in operation, there is no liability. While there was no coal mined on Sunday, the removing of the coal in the sump so that the cage might go low enough in the shaft to perform its office was as much a part of the operation of the mine as any other work.

The remaining question is, Was there a case to go to the jury? The language used in the statute is simple.

Its purpose is plain. A reading of Mr. Patton's testimony discloses that, while at one time he was an engineer, he had not been employed in that capacity for nine years, and that during the last nine years his employment was that of fireman. It is true that for at least a portion of the time he had raised and lowered the cages, but that was an incident of his employment. Upon the morning in question his duties as fireman called him a comparatively long distance from the levers which control the cages, and made it necessary for him with a hammer to try and put in order a metal strap hinge, and while engaged in this work he heard the signal bell, and, mistaking the signal, and forgetting that Mr. Capeling had told him not more than five minutes before that he was going in the sump, and not to lower the cage, he proceeded to lower it, and Mr. Capeling was severely injured. A more striking illustration of the wisdom of the statute, and a more glaring failure to observe its provisions, could not well be imagined. The circuit judge could very properly have instructed the jury that defendant was liable, but plaintiff did not ask him to do this but preferred certain requests to charge which we have quoted. These requests should have been given.

Judgment is reversed, and new trial ordered.

BLAIR and OSTRANDER, JJ., concurred. GRANT, C. J., and MONTGOMERY, J., concurred in the result, on the ground that the case is ruled by *Layzell* v. *Coal Co.*, ante, 268.

### ON REHEARING.

MOORE, J. An opinion was filed in this case June 27, 1908 (ante, 437), which opinion was withheld from official publication because a reargument was ordered before the full bench. The opinion, however, was published in 117 N. W. 182. At about the time the case was reargued the case of *Layzell* v. *J. H. Somers Coal Co.* was reargued. An opinion in the last-named case was filed April 24, 1909, and appears ante, 277, which case is controlling of

this one.   A further consideration of the case leads us to the same conclusion we reached in the opinion heretofore filed.

. Judgment is reversed, and new trial ordered.

BLAIR, C. J., and GRANT, MONTGOMERY, OSTRANDER, HOOKER, MCALVAY, and BROOKE, JJ., concurred.